1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10
11   HENRY ZARAZU,                    )   Case No. CV 13-8769-DOC (KK)
12                Petitioner,         )   FINAL REPORT AND
13          v.                        )   RECOMMENDATION OF UNITED
                                      )   STATES MAGISTRATE JUDGE
14   FRED FOULK, Warden,              )
15                Respondent.         )
16   _____ )
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   1. December 2004 Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   2. February 12, 2006 Shooting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   3. Gang Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.  PETITIONER'S CLAIMS FOR RELIEF   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   A.   Petitioner Fails to Demonstrate <u>Batson</u> Error in Claim One  . . . . . . . . . . . 19

      1.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      2.   State Court Opinion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      3.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         a.   There Is No Clearly Established Federal Law Requiring a Trial

              Court To Allow Defense Argument at Step Three of a <u>Batson</u>

              Challenge  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         b.   The State Courts' Rejection of Petitioner's <u>Batson</u> Claim Was

              Neither Contrary to, Nor an Unreasonable Application Of,

              Clearly Established Federal Law  . . . . . . . . . . . . . . . . . . . . . 24

   B.   Petitioner Fails to Demonstrate the Evidence Presented at Trial Was

        Insufficient to Prove the Gang Enhancement or First Degree Murder in

Claims Two and Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    1.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    2.     Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    3.     Gang Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    4.     First Degree Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C.    Petitioner Fails to Demonstrate a Violation of <u>Brady v. Maryland</u> in Claim
Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    1.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2.     State Court Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    3.     Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    4.     Non-Favorable Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    5.     Nonexistent Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    6.     *Potentially* Impeaching Evidence . . . . . . . . . . . . . . . . . . . . . . . . 36

D.    Petitioner Fails to Demonstrate a Violation of <u>Doyle v. Ohio</u> in Claim Four
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    1.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    2.     State Court Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    3.     Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    4.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

E.    Petitioner Fails to Demonstrate Error with Respect to the Exclusion of
Evidence in Claim Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    1.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    2.     State Court Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    3.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

F.    Petitioner Fails to Demonstrate Instructional Error in Claim Six . . . . . . . . 44

    1.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    2.     Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    3.     Voluntary Manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

a.     There is No Clearly Established Federal Law That Failure to
Instruct on a Lesser-Included Offense in a Non-Capital Case
Constitutes Constitutional Error . . . . . . . . . . . . . . . . . . . . . . . 45

b.     The State Court's Rejection of Petitioner's Voluntary
Manslaughter Instructional Error Claim Was Neither Contrary,
Nor Involved an Unreasonable Application of Clearly
Established Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

4.     Extraneous Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

G.     Petitioner Fails to Demonstrate the Impropriety of the Gang Expert
Testimony in Claim Nine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

H.     Petitioner Fails to Demonstrate Trial Court Error for Denigrating Defense
Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

I.     Petitioner Fails to Demonstrate the Prosecutor Committed Misconduct by
Disparaging Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

J.     Petitioner Fails to Demonstrate Trial Counsel Was Ineffective . . . . . . . . . 57

K.     Petitioner Fails to Demonstrate Ineffective Assistance of Appellate Counsel
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

L.     Petitioner Fails to Demonstrate Cumulative Error . . . . . . . . . . . . . . . . . . 60

VII.   RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA
10
11
12   HENRY ZARAZU,                    )   Case No. CV 13-8769-DOC (KK)
                                      )
13                   Petitioner,      )   FINAL REPORT AND
                                      )   RECOMMENDATION OF UNITED
14           v.                       )   STATES MAGISTRATE JUDGE
                                      )
15   FRED FOULK, Warden,              )
                                      )
16                   Respondent.      )
     ─────────────────────────────────)
17
18
19          This Final Report and Recommendation is submitted to the Honorable David O.

20   Carter, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-

21   07 of the United States District Court for the Central District of California.

                                      **I.**

                     **SUMMARY OF RECOMMENDATION**

24          Henry Zarazu ("Petitioner"), a California state prisoner proceeding with counsel,

25   has filed a Second Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §

26   2254 challenging his convictions for first degree murder, attempted murder, and shooting

27   at an occupied motor vehicle.  Petitioner alleges various constitutional violations,

28   including erroneous denial of a <u>Batson</u>/<u>Wheeler</u> motion, insufficient evidence,

                                      5

prosecutorial misconduct, erroneous exclusion of evidence, instructional error, erroneous gang expert testimony, judicial misconduct, and cumulative error.  For the reasons that follow, the Second Amended Petition should be denied in its entirety.

## II.

## PROCEDURAL HISTORY

On July 6, 2009, after a joint trial with codefendant Ernesto Perez, Jr. in the Superior Court of California for the County of Los Angeles, Petitioner was convicted of (1) one count of first degree murder in violation of Cal. Penal Code § 187(a); (2) two counts of attempted first degree murder in violation of Cal. Penal Code §§ 187(a), 664; and (3) one count of shooting at an occupied motor vehicle in violation of Cal. Penal Code § 246.  Lodged Doc. ("Lodg.") 1, Vol. 4[1] at 648-54, 836; Lodg. 5, Vol. 24[2] at 7205-10.  The jury also found true allegations that (1) the murder was perpetrated by means of discharging a firearm from a motor vehicle pursuant to Cal. Penal Code § 190.2(a)(21); (2) in each of the crimes a principal personally and intentionally discharged a firearm pursuant to Cal. Penal Code §§ 12022.53(b)-(e); and (3) Petitioner committed each offense for the benefit of, at the direction of, or in association with a criminal street gang pursuant to Cal. Penal Code § 186.22(b)(1).  4 CT at 648-54; 24 RT at 7205-10.  On November 23, 2009, the trial court sentenced Petitioner to a prison term of life without the possibility of parole plus 105 years to life.  2 CT at 836; 24 RT at 8114-15.

On May 28, 2010, Petitioner and Perez filed a joint appeal in the California Court of Appeal.  Lodg. 7-9.  On May 23, 2012, the California Court of Appeal affirmed the judgment in an unpublished opinion.  Lodg. 10.

---

[1] Lodged Document 1 is a copy of the Clerk's Transcript from Petitioner's trial.  Any further citations to Lodged Document 1 will cite the Clerk's Transcript or "CT," in addition to the volume number.

[2] Lodged Document 5 is a copy of the Reporter's Transcript of Petitioner's trial.  Any further citations to Lodged Document 5 will cite the Reporter's Transcript or "RT," in addition to the volume number.

On June 25, 2012, Petitioner filed a petition for review with the California Supreme Court.  Lodg. 11.  On August 22, 2012, the California Supreme Court denied the petition without comment.  Lodg. 12.

On November 5, 2013, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  Lodg. 13.  On January 30, 2014, the California Court of Appeal denied habeas relief with citations to In re Robbins, 18 Cal.4th 770, 779-81 (1998) and In re Dixon, 41 Cal.2d 756, 759 (1953).  Lodg. 14.

On November 13, 2013, Petitioner filed a Petition for a Writ of Habeas Corpus in this Court.  On December 20, 2013, Petitioner filed a First Amended Petition, followed by the instant Second Amended Petition ("SAP") on March 25, 2014.  On August 1, 2014, Respondent filed an Answer to the SAP ("Answer").  Petitioner filed a Reply on October 23, 2014.

Meanwhile, on February 4, 2014, Petitioner filed in the California Supreme Court a petition for review from the denial of habeas relief by the California Court of Appeal. Lodgs. 15-17.  On March 19, 2014, the California Supreme Court denied review.  Lodg. 18.

Thus, this matter has been submitted for decision.

### III.

### FACTUAL BACKGROUND

In affirming Petitioner's convictions, the California Court of Appeal summarized the underlying factual background.  Lodg. 6 at 2-7.  Petitioner has not challenged the state court's summary, and a review of the record reveals its accuracy.  See Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary.") (citations and internal quotation marks omitted).  Accordingly, the Court adopts the factual discussion of the California Court of Appeal opinion as a fair and accurate summary of the

evidence:[3]

### 1. December 2004 Incident

Nunez was a member of the Wicked Town Bandits, or WTB, crew. He left Los Paranderos, or LPS, to be a member of WTB. Zarazu was a member of LPS with Nunez. On December 6, 2004, Nunez was walking down the street when a blue van pulled up next to him. He heard a male voice from the van say, "You're a bitch." When he looked up, he saw Zarazu in the front passenger seat of the blue van. Concerned for his safety, Nunez began to run away. When he reached the end of the block, the van pulled up again. Again he heard a male from the van say, "You're a bitch." He ran into a nearby school and hid for 10 to 15 minutes. He came out of the school and started walking again and the blue van appeared another time. Zarazu said, "You're a bitch," and got out of the van with a bat in his hands. Zarazu chased him with the bat and he ran away. Another 20 to 30 minutes later, as he was walking down a different street, Zarazu pulled up in a green Mustang. He had seen Zarazu in the Mustang three or four times before. Three people got out of the Mustang, including Zarazu. One of them, a male Nunez did not know, approached him and said, "Stop doing the homies wrong." The man started swinging at him. Mercedes Pantoja, Nunez's girlfriend, was with Nunez. She pulled him back from the man and Nunez realized the man had stabbed him on the left side of his body.

Several days later a detective from the South Gate Police Department showed Nunez a six–pack photographic lineup. He identified Zarazu from the lineup as the person that chased him with the bat.

---

[3] Because Petitioner is challenging the sufficiency of the evidence supporting his first degree murder conviction and gang-related sentencing enhancement, the Court has independently reviewed the state court record. See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

8

### *2. February 12, 2006 Shooting*

On February 12, 2006, Zarazu and his friend Martin Sanchez picked up Perez from his mother's house at approximately 10:40 p.m. Zarazu was driving a Mustang. Perez's lower body was paralyzed as a result of a shooting in 2002 and he used a wheelchair, but he had full use of both hands. Zarazu and Sanchez picked up and placed Perez in the front seat of the car, and the three left.

Nunez was at Murillo's house that evening when he received a call from his friend, 12–year–old Herrera. Herrera and Murillo were also members of WTB. The night of the shooting, Nunez told detectives that Murillo had received the call from Herrera, not him. In any event, Herrera sounded out of breath. He said he was being chased and he asked Nunez to pick him up on San Carlos Avenue in front of "Pepe's" house. Nunez and Murillo drove to San Carlos Avenue and parallel parked on the street. They went in Nunez's car, a Chrysler Cirrus. There was a car parked about two feet in front of Nunez and cars parked about 20 feet behind his car. Herrera ran out from behind a van that was parked across the street and got into the Chrysler.

Zarazu's green Mustang then pulled up. Its passenger side was about three feet from Nunez's driver's side. Nunez saw a gun pointing out from the passenger's side of the Mustang. He also saw Zarazu in the driver's seat leaning forward and looking to the right at his car. Zarazu's right hand was on the steering wheel and had a white cast on it. He had seen Zarazu while he was driving the Chrysler four or five times before, and he had conversed with Zarazu while driving the Chrysler.

When he saw the gun, Nunez turned his car on and reversed, punching the accelerator. He heard two groups of shots being fired. As he was reversing, his car crashed into something three times. He reversed for approximately half a block and then tried to go forward but could move only five feet because the

back of his car was smashed.  He heard Herrera say he had been shot.  The Chrysler came to a stop partially up on the curb.  Murillo and Nunez went to the backseat to check on Herrera.  Nunez was going to try to pick up Herrera, but before he could, the police arrived.  They arrived approximately a minute to a minute and a half after the shooting.  Herrera died of a gunshot wound to the chest.

Nunez told detectives that Zarazu was involved in the shooting.  They showed him a six–pack photographic lineup, and he identified Zarazu from the lineup as the person who was driving the Mustang.  A photograph taken of Zarazu just after the shooting at the police station showed him with a wrap on his right arm.

Nunez said that there was not a gun inside his car on the night of February 12, though he was not certain whether his passengers had a gun on them.  At trial, he said his girlfriend, Pantoja, was not in the car or at the scene of the shooting.  But the night of the shooting, he told detectives Pantoja was in his car.

Police took Nunez to the area of San Juan Avenue and Tweedy Boulevard where a crashed car was located.  He identified the car as the Mustang involved in the shooting.  Later that evening while being interviewed by the police, he told officers that Murillo was driving the Chrysler.  He did not tell them that he was actually the driver because he did not have a license and did not want a ticket.  He told the truth—that he was driving—when he testified at the preliminary hearing.

Juan Rios was driving in the area of the shooting on San Carlos Avenue on the night of February 12, 2006.  As he was driving on San Carlos Avenue, a black Mustang was going in the opposite direction on the same street.  Both cars slowed down as they passed each other because of the narrowness of the street.  Rios saw three people in the Mustang—two people in the front of the

10

1    car, and a person in the back.  At the end of the block he made a right turn onto
2    another street.  He then heard gunshots.

3         C.F. lived on San Carlos Avenue on February 12, 2006.  Around 11:30
4    or 11:40 that night he was awakened by the sounds of screeching tires and
5    gunshots.  He heard multiple groups of shots.  He also heard a male voice yell
6    out, "We're number one."

7         O.B. was at a house on San Carlos Avenue at approximately 11:30 p.m.
8    on February 12.  He heard two series of gunshots sounding as if they came from
9    different guns.  O.B. looked outside his window after he heard the gunshots and
10   saw two people getting out of a crashed car.  He saw one of those people walk
11   up the driveway of his neighbor's property, and some time later the person came
12   out of the driveway.  A woman knocked on O.B.'s door after he heard the shots.
13   She asked for water and used his telephone with his permission.  He identified
14   Pantoja from a photograph as the woman who used his telephone.

15        South Gate Police Officer Adam Cook responded to a call of shots being
16   fired.  He arrived at the scene of San Carlos Avenue at approximately 11:30
17   p.m. and saw a car crashed into a tree.  Nunez and Murillo were outside the car
18   and Herrera was in the backseat and had a gunshot wound.  Murillo appeared
19   to be walking out of a nearby driveway.  Officers later found a .45–caliber
20   Webley revolver in the driveway near where Officer Cook saw Murillo.

21        Officer Edward Bolar heard a call that shots had been fired on San Carlos
22   Avenue on the night of February 12.  He was on his way to assist officers at the
23   scene when he saw a green Mustang in front of him on San Juan Avenue.  He
24   was traveling at a high speed and had his lights and sirens on.  When he was
25   approximately one car length away from the Mustang, it accelerated from 25
26   or 30 miles per hour to 65 to 75 miles per hour.  He notified dispatch that he
27   had a green Mustang leaving him at a high rate of speed, and Officer Cook then
28   mentioned over the radio that it was possibly a suspect vehicle.  Officer Bolar

continued to follow the Mustang, and when it came to the intersection of San Juan Avenue and Tweedy Boulevard, it hit some dips in the road and the driver lost control. The Mustang crashed into some parked vehicles and came to a stop. Zarazu was in the driver's seat of the Mustang, Perez was in the front passenger's seat, and Sanchez was in the backseat. Perez was wearing a black Pittsburgh Pirates baseball cap with a gold "P" on it.

Officers found a pistol near the intersection of San Juan Avenue and Tweedy Boulevard. The only fingerprint lifted from the gun was of such poor quality it was not useful for comparison purposes. Firearms examiner Donna Reynolds recovered three fired .40–caliber cartridge cases from the scene of the shooting on San Carlos Avenue, and four more a little further down the street. The locations of the cartridge cases suggested groups of shots were fired from two different locations. She also recovered a fired bullet from a car parked on San Carlos Avenue, one from in front of a house on San Carlos Avenue, and one from under Nunez's Chrysler. She observed bullet impacts and bullet holes on the Chrysler and also recovered a fired bullet jacket from the engine compartment of the Chrysler. All of the bullets and cartridge cases Reynolds recovered, as well as the bullet recovered from Herrera's chest, were fired from the pistol found at San Juan Avenue and Tweedy Boulevard, near the Mustang.

Reynolds was also the one who recovered the revolver from the driveway near the location where Nunez's Chrysler had crashed. The revolver was loaded with two .45–caliber half–moon clips that were live, meaning they had not been fired. She recovered another .45–caliber half–moon clip on the floorboard of Nunez's Chrysler, and another from the gutter in front of a house on San Carlos Avenue.

Officers collected gunshot residue kits from the occupants of both Zarazu's Mustang and Nunez's Chrysler. One particle highly unique to gunshot residue and numerous particles consistent with gunshot residue were found on

Zarazu's hands. Numerous particles unique to gunshot residue were found on Perez's hands. One particle consistent with gunshot residue was found on Sanchez's hands.

One highly specific particle of gunshot residue and several consistent particles were found on Nunez's left hand, and none were found on his right hand. Several consistent particles were found on Murillo's hands. Herrera had no gunshot residue particles on either hand.

### 3. Gang Evidence

Detective Derek O'Malley with the South Gate Police Department was the prosecution's gang expert. Detective O'Malley testified that gang members typically earn tattoos by "putting in work." "Putting in work" consists of committing street crimes, attacking rival gang members, tagging in rivals' areas, or otherwise challenging them. The more violence a gang member commits, the more prominent his or her tattoos. Tattoos that denote membership in a Southern California gang include the letters "L.A.," signifying the Los Angeles area. A tattoo of three dots together represents "My crazy life," or "Mi vida loc[a]." Many gang members feel as if they have a "demon" or an "evilness" inside them, and they will tattoo demons or skulls or the like on their bodies to represent this feeling. The name of the gang is another common tattoo. Gangs also commonly affiliate themselves with a sports team. They will pick a prominent word in their name and find a sports team that begins with the same letter.

Detective O'Malley is familiar with LPS. WTB is the primary rival of LPS. When Nunez left LPS for WTB, this precipitated the rivalry between the two. It was the ultimate sign of disrespect to leave LPS for WTB because it suggested that WTB was better. It is uncommon for a gang member to leave one gang for another because when a person joins a gang, that person is pledging loyalty to the gang. The mentality is that the gang members will give

their lives for one another.  Respect is very important to gangs.  Within the gang, one gains respect by putting in work and representing the gang at all times.  The "crazier" one's "work" is, the more respect he or she earns.

Detective O'Malley had several contacts with Zarazu in the field.  During one of those contacts, Zarazu told the detective that he belonged to LPS and his moniker was "Spider."  His last contact with Zarazu in the field was in December 2005.  Detective O'Malley saw him on the street and asked how he had been doing.  He said he had been getting straight "A's" in calculus, and the detective told him he was impressed and encouraged him to use school to stay out of gangs.  Zarazu responded that his neighborhood was his "life."  Officer Carlos Corella also had contacts with Zarazu in the field and heard him say he is a member of LPS and that his moniker is "Spider."

The primary activities of LPS are felony vandalism, assaults with a deadly weapon, battery, and firearms offenses in violation of Penal Code former sections 12021, 12025, and 12031.  LPS's common sign or symbol was the letter "P," and the gang affiliated itself with the Pittsburgh Pirates sports team.

Detective O'Malley had contacts with Herrera during which he admitted that he was a WTB member with the moniker "Little Loco."  He had contacts with Nunez in which he found out that he was a member of LPS and then left that gang to join WTB.  His moniker was "Temper."  The area of the shooting on San Carlos Avenue was in WTB's territory.

For gang members who are paraplegics, it would be hard for them to feel like they could carry their own weight in the gang.  It would be important to them to get new tattoos to show they are still active members of the gang.  Also, actually pulling the trigger in a shooting would give the shooter a higher status in the gang.  Perez started getting tattoos after he was shot.  He has tattoos on his left hand saying "L.A." and "LPS."  He has a tattoo of three dots

14

below his right eye.  He has a tattoo of a joker pointing a gun that says, "The last laugh is mine, motherfuckers."  He has a tattoo of a skull with a bullet hole and smoke coming out of the hole, and it says " R.I.P. LPS."  Another of his tattoos is a demon with horns smoking a pipe, with a hand sign that forms the letter "P," representing LPS.  The same tattoo also has script that says, "Smoke a bowl" and "Fuck a hoe."  The latter statement was typical of an "I–don't–care attitude."   Another of Perez's tattoos depicted a demon with skeletal hands forming the LPS sign, the letter "P."  Detective O'Malley had seen Perez on the street with other known LPS members.

After the prosecution posed a hypothetical tracking the facts of this case, Detective O'Malley opined that the shooting was done for the benefit and furtherance of LPS.  This was based on the rivalry between LPS and WTB, and that a member of WTB had gotten into a car with another WTB member who had already disrespected LPS by leaving the gang.  The shooting would have established LPS's dominance and control.

Lodg. 10 at 2-9.

## IV.

## PETITIONER'S CLAIMS FOR RELIEF

Petitioner's claims, as presented in the SAP, are as follows.

1.     Claim One: The trial court improperly adjudicated Petitioner's motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and People v. Wheeler, 22 Cal.3d 258 (1978).

2.     Claim Two:  The evidence presented at trial was insufficient to prove the gang allegations.

3.     Claim Three:  The prosecutor committed misconduct pursuant to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

4.     Claim Four: The prosecutor committed misconduct pursuant to Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

15

5.     Claim Five:  The trial court erroneously excluded evidence of the victim's gang membership.

6.     Claim Six: The trial court erred by failing to instruct on voluntary manslaughter.[4]

7.     Claim Seven:  The evidence presented at trial was insufficient to prove first degree murder.

8.     Claim Eight:  The trial court erred by instructing the jury on extraneous factors.

9.     Claim Nine: The testimony of the gang expert invaded the province of the jury.

10.    Claim Ten: The trial court unfairly denigrated defense counsel in front of the jury.

11.    Claim Eleven: The prosecutor improperly disparaged defense counsel during closing arguments.

12.    Claim Twelve: Appellate counsel rendered ineffective assistance by failing to raise Claims Eight through Eleven on direct appeal.

13.    Claim Thirteen: Trial counsel rendered ineffective assistance of counsel by failing to object to the disparaging remarks discussed in Claim Eleven.

14.    Claim Fourteen:  All of the errors alleged herein resulted in cumulative error.[5]

---

[4]  Petitioner references "involuntary" manslaughter in his claim.  SAP, at 6.  However, it is apparent from Petitioner's additional references to manslaughter resulting from heat of passion and provocation that he intended to base his claim on the voluntary manslaughter instruction.  See Cal. Penal Code § 192(a) (voluntary manslaughter is the unlawful killing of a human being without malice and upon a sudden quarrel or heat of passion).  Further proof of Petitioner's intent to refer to voluntary manslaughter is Petitioner's state law claim, which cites voluntary manslaughter as the basis for his instructional error claim.  Lodg. 11 at 65-72.

[5]  The SAP presents a cursory version of Petitioner's claims.  Because Petitioner is represented by counsel, the Court need not liberally construe the Petition.  Compare Allen

1  SAP, at 5-16.[6]  Respondent contends all of these claims fail on the merits.  Answer, at 9-

2  108.[7]

3                                           **V.**

4                               **STANDARD OF REVIEW**

5          A federal court may review a habeas petition by a person in custody under a state-

6  court judgment "only on the ground that he is in custody in violation of the Constitution

7  or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas relief is

8  not available for state-law errors.  Swarthout v. Cook, 562 U.S. 216, 131 S. Ct. 859, 861,

9  178 L. Ed. 2d 732 (2011) (per curiam) (citing Estelle v. McGuire, 502 U.S. 62, 67, 112 S.

10  Ct. 475, 116 L. Ed. 2d 385 (1991)).

11          Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

12  federal court may not grant habeas relief on a claim adjudicated on its merits in state

13  court unless the adjudication:

14          (1)     resulted in a decision that was contrary to, or involved an unreasonable

15                  application of, clearly established Federal law, as determined by the

16                  Supreme Court of the United States; or

17          (2)     resulted in a decision that was based on an unreasonable determination of

18  _____

19  v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) (stating that courts must "construe *pro*

20  *se* habeas filings liberally" (emphasis added)).  However, to allow Petitioner the benefit
    of a full review of his claims, the Court refers to the arguments presented on direct and

21  habeas review in the state courts where necessary to supplement the claims presented in
    the SAP.

22      [6]  Petitioner's claims are numbered One through Eleven in the SAP.  This Court has
    renumbered the claims for clarity.

23      [7]  Respondent also contends Claims Eight through Thirteen are procedurally barred in

24  light of the California Court of Appeal's citations to In re Robbins, 18 Cal.4th 770, 779-
    81 (1998) and In re Dixon, 41 Cal.2d 756, 759 (1953).  Answer, at 4-7.  Because

25  Petitioner's claims are easily resolved on the merits, while the procedural default

26  argument is much more complex, in the interest of judicial economy, this Court considers
    the claims on the merits rather than addressing the procedural default issue.  See 28

27  U.S.C. § 2254 (b)(2) (district court has authority to deny unexhausted claims on their

28  merits).

                                            17

1  the facts in light of the evidence presented in the State court proceeding.

2  28 U.S.C. § 2254(d).

3  "Clearly established federal law" means federal law that is clearly defined by the

4  holdings of the Supreme Court at the time of the state-court decision.  See, e.g., Cullen v.

5  Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011).  Although

6  only Supreme Court law is binding, "circuit court precedent may be persuasive in

7  determining what law is clearly established and whether a state court applied that law

8  unreasonably."  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citation omitted).

9  In determining whether a decision is "contrary to" clearly established federal law, a

10  reviewing court must evaluate whether the decision "'applies a rule that contradicts

11  [such] law' and how the decision 'confronts [the] set of facts' that were before the state

12  court."  Cullen, 131 S. Ct. at 1399 (quoting Williams v. Taylor, 529 U.S. 362, 405, 408,

13  120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  If the state decision "'identifies the correct

14  governing legal principle' in existence at the time," a reviewing court must assess

15  whether the decision "'unreasonably applies that principle to the facts of the prisoner's

16  case.'"  Id. (quoting Williams, 529 U.S. at 413).  An "unreasonable application" of law is

17  "'different from an incorrect application'" of that law.  Harrington v. Richter, 562 U.S.

18  86, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011) (quoting Williams, 529 U.S. at 410)

19  (emphases omitted).  Similarly, a state-court decision based upon a factual determination

20  may not be overturned on habeas review unless the factual determination is "'objectively

21  unreasonable in light of the evidence presented in the state-court proceeding.'"  Stanley,

22  633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

23  The AEDPA standard requires a high level of deference to state-court decisions,

24  such that a state court's decision will be upheld if "fairminded jurists could disagree as to

25  whether it was correct."  Gulbrandson v. Ryan, 738 F.3d 976, 990 (9th Cir. 2013)

26  (citation and internal quotation marks omitted).  Even if this Court finds such a state-

27  court error of clear constitutional magnitude, habeas relief is not available unless the error

28  "had substantial and injurious effect or influence in determining the jury's verdict."  Fry

18

1  v. Pliler, 551 U.S. 112, 116, 121–22, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (citations

2  and internal quotation marks omitted).

3      Where, as it did with Petitioner's direct appeal, the California Supreme Court

4  denies a petitioner's claims without comment, the state high court's "silent" denial is

5  considered to be "on the merits" and to rest on the last reasoned decision on these claims.

6  See Ylst v. Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706

7  (1991); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992).  In the case of Claims

8  1-7, 11, and 14, the last reasoned decision is that of the California Court of Appeal in its

9  decision on direct review.

10      Where, as here with respect to Claims 8-10, and 12-13, the state courts supply no

11  reasoned decision on the claims presented for review, this Court must perform an

12  "'independent review of the record' to ascertain whether the state court decision was

13  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003)

14  (citing Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000)).

**VI.**

**DISCUSSION**

**A.    Petitioner Fails to Demonstrate Batson Error in Claim One**

   **1.    Background**

   In Claim One, Petitioner argues the trial court erred by (1) refusing to permit

defense argument at the third step[8] of its analysis of his Batson motion; and (2) denying

the Batson motion.  SAP, at 5.

   The California Court of Appeal accurately detailed the facts leading up to

Petitioner's Batson motion, as follows:

       Here, appellants' *Wheeler/Batson* claim relates to prospective Juror No.

_____

   8    A motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed.
2d 69 (1986), as detailed further *infra* Section VI.A.3.b.i., requires the trial court to
engage in a three-step analysis.  See Johnson v. California, 545 U.S. 162, 168, 125 S. Ct.
2410, 162 L. Ed. 2d 129 (2005).

19

4132, an African–American.  Juror No. 4132 was a dean of students at a high school.  His father was a social worker at a California women's correctional facility.  His mother's cousin was on death row.  He had visited the cousin four or five times over the years.  He did not attend any of the court proceedings in the cousin's case.  He said he did not think the situation would affect his ability to be fair and impartial in this case.  The prosecutor asked him whether he had formed an opinion as to how the criminal justice system works based on his father's work in the prison system or his mother's cousin.  He responded: "Well, yes, but I don't think—Yeah, I mean I think it would be natural to form some kind of an opinion, but I don't really think it's biased one way or another. It's more interesting than anything else, I guess."  The court asked whether there was any discussion in his family that the cousin was treated unfairly.  He responded:  "Yeah, a little bit because the co–conspirator in the case is now being brought back to L.A. to have a new penalty phase.  There was some question as to, you know, whether or not the person who—there was some question as to whether or not they got the right person."  He also said that while his family all thought the cousin had something to do with the crime, "perhaps [the cousin] was treated unfairly in the penalty phase," but that he did not think this would affect his ability to be fair to both sides of the case.

The prosecution exercised a peremptory challenge to remove Juror No. 4132.  When the prosecution exercised another peremptory challenge to remove Juror No. 4887, appellants made a *Wheeler*/*Batson* motion on the grounds that the prosecution had struck two African–American males.  At that point, the prosecution had exercised nine total peremptory challenges.  No African–American males had been impaneled yet.  The court found a prima facie case under *Wheeler*/*Batson* and asked the prosecutor to state her reasons for excusing both jurors.

As to Juror No. 4887, her reasons were as follows:  He had previously

20

sat on a hung jury; when another prospective juror explained that he had been "jumped" by African–Americans, Juror No. 4887 laughed and shook his head, indicating to the prosecutor that he might not get along well with others; his son had been arrested for grand theft auto, and he felt his son was innocent; he had been arrested when he was 16; and the prosecutor overheard him in the hallway telling another juror that he was hoping to stay a little while longer, which she took as an indication that he was unmotivated, did not want to work, and essentially wanted a vacation when he came to jury duty.

As to Juror No. 4132, her reasons were as follows:  His mother's cousin was on death row, where he had visited the cousin a few times; he felt that the penalty phase of the cousin's prosecution was unfair; he had formed some opinions regarding the courts; and because the cousin must have been convicted of murder, she did not want him approaching this case from what she perceived to be a defense perspective and relating too much to the family members of appellants.  The prosecutor noted for the record that appellants were Hispanic, and she had excused two African–American males, four Caucasian people, one Asian female, and two Hispanic people.  The court found that the prosecution's reasons for striking the two jurors were race neutral and denied the *Wheeler/Batson* motion.

Lodg. 10 at 11-13 (footnote and citations omitted).

After the trial court denied the defense motion without argument at step three of the analysis, Petitioner's counsel asked to put something on the record.  The trial court simply stated that, "We are done with this."  4 RT at 665.  A short time later, after the prospective jurors had been excused, the trial court initiated the following exchange with Petitioner's counsel:

The Court:  All right.  All the jurors are out.

Counsel, I want to make a point with you.

21

As to you, Mr. Pitman [Petitioner's counsel], when I make a ruling, I gave you a chance to argue.  [Co-defendant's counsel] joined your argument. I gave the people a chance to respond.  I made a ruling.  That's the end of it.  I am not going to sit up there and argue with you about my ruling.  Once I make a ruling, that's it.

[Petitioner's Counsel]:  May I be heard, your honor?

The Court:  No, you may not.  I just want to make this clear to you.  I gave you a chance to argue and [co-defendant's counsel] joined it.  And Miss Potts made her argument.  I made my ruling.  That's the end of it.  I'm not going to sit up there and discuss each of my rulings with you.

[Petitioner's Counsel]:  I'm not asking the court to do that.  But we hadn't heard her response, so we didn't have an opportunity to comment on her --

The Court:  You don't get an opportunity to comment.  You don't get an opportunity to comment.  This is -- I don't have to give you an opportunity to comment.  You made your motion, I heard her response, I made my ruling. That's it.

[Petitioner's Counsel]:  Okay.

The Court:  I don't have to hear your comments.

[Petitioner's Counsel]:  Well, I respectfully disagree just on that issue. I know when the court rules, the court has ruled.  But on that issue where she's making a justification, I think we're entitled to argue to the court that the justification is not sufficient.  And I apologize for that.

The Court:  You made your argument, she made her argument, I made my ruling.  I don't want to sit there and rehash every ruling I make.  Let me make that clear to you.

4 RT at 667-68.

## 2.    State Court Opinion

22

On direct appeal, the California Court of Appeal denied Petitioner's claim that the trial court erred by not allowing the defense to present argument at step three of the <u>Batson</u> analysis.  The Court of Appeal concluded the trial court did not error by conducting an abbreviated analysis and that to the extent there was error it was harmless.  Lodg. 10 at 14-16.

The California Court of Appeal also concluded Petitioner's <u>Batson</u> claim was meritless.  The Court of Appeal found "substantial evidence supported the trial court's conclusion that the prosecution offered a race–neutral explanation for striking Juror No. 4132," in light of his relation to a death row inmate and his apparent views on the justice system.  Lodg. 10 at 13.  The state court went on to compare Juror 4132 to another juror excused by the prosecutor for similar reasons, concluding this offered support for the finding that the prosecutor's reasons were not pretextual.  Lodg. 10 at 13-14.

**3.   Discussion**

  **a.   <u>There Is No Clearly Established Federal Law Requiring a Trial Court To Allow Defense Argument at Step Three of a Batson Challenge</u>**

For Petitioner to merit habeas relief, the state court's decision must have been contrary to, or an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court.  <u>Carey v. Musladin</u>, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).  Here, the Ninth Circuit has unequivocally held that a state court does not violate clearly established federal law when it refuses to allow defense argument at step three of a <u>Batson</u> challenge.  <u>Lewis v. Lewis</u>, 321 F.3d 824, 831 n.27 (9th Cir. 2003) ("Certainly, requiring a court to allow defense counsel to argue is not clearly established law.").  Hence, under <u>Lewis</u>, Petitioner is not entitled to habeas relief on his claim that the trial court erred in refusing to allow defense counsel to present argument at step three of Petitioner's <u>Batson</u> challenge.

1

2

3

       **b.**    **The State Courts' Rejection of Petitioner's Batson Claim Was Neither Contrary to, Nor an Unreasonable Application Of, Clearly Established Federal Law**

4

5

6

Petitioner's argument that the trial court erred in denying his <u>Batson</u> claim is also meritless.  As explained below, the trial court properly denied Petitioner's <u>Batson</u> motion because Petitioner cannot show purposeful discrimination.

7

                **i.**    **Legal Standard**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Under clearly established federal law, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." <u>Batson v. Kentucky</u>, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).  The Supreme Court has articulated a three-part test to govern the analysis of <u>Batson</u> claims. <u>Johnson v. California</u>, 545 U.S. 162, 168, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005).  First, the defendant must make out a prima facie case by showing the totality of the relevant facts gives rise to an inference of discriminatory purpose. <u>Id.</u>  Second, once the defendant has made out a prima facie case, the burden shifts to the prosecution to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. <u>Id.</u>  Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. <u>Id.</u>  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." <u>Purkett v. Elem</u>, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam).

23

24

25

26

Because the trial court found Petitioner had made a prima facie showing at step one of the analysis and sought the prosecutor's reasons for using her peremptory challenges at step two of the analysis, this Court focuses on the propriety of denying Petitioner's claim at step three of the analysis.

27

As the Supreme Court has stated:

28

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. . . . [T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanation to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

Miller-El v. Cockrell, 537 U.S. 322, 338-39, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) ("Miller-El I") (explaining Purkett, 514 U.S. at 768). "When conducting the analysis at the third step, the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination." Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008).

"Although the burden remains with the defendant to show purposeful discrimination, the third step of Batson primarily involves the trier of fact." Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006). The trial court "must evaluate the record and consider each explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" Id. (quoting Hernandez v. New York, 500 U.S. 352, 363, 111 S. Ct. 1859, 114 L. Ed.2d 395 (1991)) (other internal quotation marks and citation omitted). Thus, when considering the "totality of the relevant facts" under Batson's third step, courts "must review the record," including voir dire transcripts and venire members' questionnaires, to determine if a prosecutor's reasons for exercising a peremptory challenge are pretextual. Id. at 360, 371 (internal quotation marks and citation omitted).

In Miller-El v. Dretke, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) ("Miller-El II"), the Supreme Court endorsed using a comparative analysis to review striking some jurors and not others. The relevant portions of the record for this

analysis includes not only the prosecutor's statements about his or her jury selection strategy and his or her explanations for the peremptory strikes, but also the characteristics of the venire members that were not challenged. Kesser, 465 F.3d at 360; see also Miller-El II, 545 U.S. at 241 (finding that side-by-side comparisons of minority venire members who were struck and nonminority venire members allowed to serve are more powerful than bare statistics). "If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar non[minority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El II, 545 U.S. at 241. Thus, it is clear that when conducting a comparative juror analysis at step three courts must compare the excused jurors in question with similarly situated jurors who were allowed to remain on the jury.

### ii.    Analysis

The California Court of Appeal's comparative juror analysis in Petitioner's case was admittedly flawed. Rather than comparing Juror 4132 to seated jurors, the state court compared Juror 4132 to another juror who had been excused by the prosecutor.[9] However, "it is unclear under [Ninth Circuit] caselaw whether this flawed comparative analysis itself indicates that the state court decision "involved an unreasonable application of [] clearly established Federal law, such that our review of [Petitioner's] Batson challenge ought to be de novo." Briggs v. Grounds, 682 F.3d 1165, 1182 (9th Cir. 2012) (Berzon, J., dissenting) (internal citation omitted). In any event, this Court need not decide the appropriate standard of review to apply here, as Petitioner's claim fails even under de novo review.

In response to Petitioner's Batson motion, the prosecutor gave the following explanation for excusing Juror 4132:

---

[9] The Court recognizes that the state court may have opted for such an analysis because, as explained below, none of the seated jurors were similarly situated to Juror 4132.

And, if I can, I remember the major reason that I asked to excuse the other juror, but let me -- and that was just basically that his mother's cousin was on death row, that he has visited the mother's cousin a few times, that he felt that the penalty phase of the prosecution was unfair, and he had formed some opinions regarding the courts.

He was just basically -- based on that, he was just basically a wild card. And I felt that in this case, in a serious case, a special circumstance case where it is a murder, and where his mother's cousin must have also been convicted of murder, that I didn't want him approaching it from what I necessarily perceive to be a defense perspective where he could be considering the effects on the family members. And there have been family for both defendant Zarazu and defendant Perez present in court. And so I just -- I don't want him relating too much to the -- to the family of the accused.

4 RT at 663-64.

The prosecutor legitimately relied on the fact that Juror 4132 had a relative on death row when exercising a peremptory challenge to excuse that juror. See, e.g., Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004) (brother's conviction for cocaine possession was a facially neutral reason for challenging juror); United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987) ("reasonable" to challenge black juror whose brother was in prison for armed robbery), overruled on other grounds by Huddleston v. United States, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988); Messiah v. Duncan, 435 F.3d 186, 201 (2d Cir. 2006) (prosecutor could reasonably have believed that juror who had been prosecuted by his office and who had relatives in prison would be unduly sympathetic to defendant and hostile to the prosecutor); United States v. Crawford, 413 F.3d 873, 875 (8th Cir. 2005) ("There is no Batson violation when a juror is dismissed because juror's relatives have been prosecuted or convicted of a crime.").

Moreover, comparing Juror 4132 with seated jurors also supports a finding that the prosecutor excused Juror 4132 out of a concern that Juror 4132 was biased. Unlike Juror

4132, none of the seated jurors had a relative convicted of a serious offense. Admittedly, Juror 8332 (seated as Juror 5) stated during voir dire that she had a nephew who "in his youth, he got into trouble." 3 RT at 366. However, Juror 8332 explained she did not keep in contact with the nephew and believed he had turned his life around. 3 RT at 367. Similarly, Juror 0489 (seated as Alternate Juror 4) had a sister-in-law who was charged with a felony. However, her crime was "paint[ing] the street" due to schizophrenia. 6 RT at 1341, 1366. Jurors 8332 and 0489 can hardly be said to be similarly situated to Juror 4132, who had a relative on death row that he visited multiple times and believed might have been treated unfairly during the penalty phase. The fact that no seated jurors had relatives convicted of serious offenses is consistent with the notion that the prosecutor refused to seat any jurors with a background similar to that of Juror 4132.[10] Hence, comparing Juror 4132 to other jurors who were not stricken, as per Miller-El II, also indicates the prosecutor's refusal to seat Juror 4132 was not racially discriminatory.

Based on this record, it is clear the prosecutor refused to seat any prospective juror who had family members charged with a serious criminal offense, regardless of other biographical characteristics. See Miller-El II, 545 U.S. at 241. For this reason, Petitioner failed to show the prosecutor improperly excused Juror 4132 based on race, or that the trial court erred in denying Petitioner's Batson claim. Accordingly, the state courts' rejection of Petitioner's Batson claim was neither contrary to, nor an unreasonable

---

[10]   In addition, it is important to note that a number of *other* prospective jurors who had family members that had been in serious trouble with the law were also excused during voir dire. For example, Juror 6002 had a brother-in-law who was charged with robbery, 3 RT at 363; Juror 2765 stated that his father had an extensive criminal history, 3 RT at 365; Juror 0468 had a brother who received a five year prison sentence related to a bar fight, 3 RT at 364; Juror 7563 had a son-in-law being prosecuted for gross vehicular manslaughter, 3 RT at 390, 401-02; Juror 5389 had family members charged with drug possession and distribution, 4 RT at 625, 649-50; Juror 4425 had family members charged with drug possession and assault, 5 RT at 957; Juror 8103 had a step-son and the step-son's girlfriend living in her house following their release from prison on drug charges, 5 RT at 1048-50; and Juror 0021 had a son who was incarcerated (5 RT at 1052). None of these jurors were selected to sit on the jury.

application of, clearly established federal law.  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on Claim One.

**B.    Petitioner Fails to Demonstrate the Evidence Presented at Trial Was Insufficient to Prove the Gang Enhancement or First Degree Murder in Claims Two and Seven**

### 1.    Background

In Claim Two, Petitioner argues the prosecution failed to present sufficient evidence to support the gang enhancement.  SAP, at 5.  In Claim Seven, Petitioner alleges the evidence was insufficient to support his first degree murder conviction.  SAP, at 14.

### 2.    Legal Standard

The Fourteenth Amendment's Due Process Clause guarantees a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Supreme Court has held "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319; see also Wright v. West, 505 U.S. 277, 284, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992).

When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution.  Jackson, 443 U.S. at 326.  "Jackson cautions reviewing courts to consider the evidence 'in the light most favorable to the prosecution.'"  Bruce v. Terhune, 376 F.3d

950, 957 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 319).  Additionally,

"[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a

conviction."  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

     The <u>Jackson</u> standard applies to federal habeas claims attacking the sufficiency of

the evidence to support a state conviction.  <u>Juan H.</u>, 408 F.3d at 1274; <u>Chein</u>, 373 F.3d at

983; <u>see also</u> <u>Bruce</u>, 376 F.3d at 957.  The AEDPA, however, requires the federal court to

"apply the standards of <u>Jackson</u> with an additional layer of deference."  <u>Juan H.</u>, 408 F.3d

at 1274.  The federal court must ask "whether the decision of the California Court of

Appeal reflected an 'unreasonable application' of <u>Jackson</u> and <u>Winship</u> to the facts of this

case."  <u>Id.</u> at 1275 & n.13.

     When assessing a <u>Jackson</u> claim, the federal court must first refer to the substantive

elements of the criminal offense as defined by state law and look to state law to determine

what evidence is necessary to convict on the crime charged.  <u>Jackson</u>, 443 U.S. at 324

n.16; <u>Juan H.</u>, 408 F.3d at 1275.

### 3.    Gang Enhancement

     Petitioner's jury found true allegations that Petitioner committed each offense for

the benefit of, at the direction of, or in association with a criminal street gang pursuant to

California Penal Code § 186.22(b)(1).[11]  4 CT at 649, 651, 653, 654.  Petitioner argues

the evidence was insufficient to support this finding because the prosecution's gang

expert had no knowledge of the gang's primary activities.  Petitioner does not otherwise

challenge the sufficiency of the evidence to support the gang enhancements.  SAP, at 5.

     Subdivision (b) of section 186.22 provides for a sentencing enhancement when the

defendant is "convicted of a felony committed for the benefit of, at the direction of, or in

association with any criminal street gang, with the specific intent to promote, further, or

assist in any criminal conduct by gang members . . ." Cal. Penal Code § 186.22 (b)(1).

As used in section 186.22, "'criminal street gang' means any ongoing organization,

---

[11] In the SAP, Petitioner refers to "Cal. Penal Code 186.22(e)."  SAP, at 5.  Subsection
(e) appears to have been cited in error.

1    association, or group of three or more persons . . . having as one of its primary activities

2    the commission of one or more of the criminal acts enumerated" in subsection (e).  Cal.

3    Penal Code § 186.22(f).

4        The California Court of Appeal denied Petitioner's claim on direct review.  The

5    state court concluded (1) state law allows expert testimony to form the basis of a primary

6    activities finding, (2) the prosecution's gang expert was knowledgeable about the subject

7    at issue, and (3) the expert testified that the primary activities of the LPS gang included

8    felonies enumerated in the gang statute.  Lodg. 10 at 17-18 (citations omitted).

9        This Court's review confirms the state court's conclusions.  South Gate Police

10   Detective Derek O'Malley testified as the prosecution's gang expert.  10 RT at 2546-55;

11   11 RT at 2714-70, 2790-97, 2801-04, 2807-28, 3045-94, 3103-13, 3116-32, 3135-36.

12   While Detective O'Malley was cross-examined about his expertise, 12 RT at 3084-94,

13   the defense did not object to his qualifications as a gang expert.  As the state court

14   explained, Detective O'Malley testified LPS's primary activities included assaults with

15   deadly weapons, felony vandalism, and various weapons violations, 11 RT at 2731, all of

16   which are statutorily enumerated in subsection (e).  Cal. Penal Code § 186.22(e).  The

17   record reflects Detective O'Malley had substantial experience with gangs generally, and

18   the LPS gang specifically.  10 RT at 2546-55; 11 RT at 2714-39.  The jury was permitted

19   to infer from Detective O'Malley's expert testimony alone that the LPS's primary

20   activities included one or more of the statutorily enumerated felonies.  See People v.

21   Sengpadychith, 26 Cal.4th 316, 324 (2001) (citing People v. Gardeley, 14 Cal.4th 605,

22   620 (1997) ("Sufficient proof of [a] gang's primary activities might consist of . . . expert

23   testimony" that gang's primary activities included one or more of the statutorily

24   enumerated felonies.)).

25       To the extent Petitioner argues the gang expert's opinion regarding the LPS's

26   primary activities was itself unsupported, and therefore the gang enhancement lacks

27   sufficient evidence, such a claim is meritless.  The expert's personal experience –

28   including the expert's conversations with LPS gang members, conversations with

1  colleagues, and review of relevant police records, 10 RT 2551-52; 12 RT at 3136 – is
2  evidence of a type reasonably relied upon by gang experts when testifying about a gang's
3  primary activities, and thus provides proper grounds for the expert's opinion.  See
4  Gardeley, 14 Cal.4th at 620.  To the extent Petitioner might suggest Detective O'Malley's
5  testimony was insufficient absent reference to specific examples of the enumerated
6  crimes, such a claim is meritless.  While "proof of [a] gang's primary activities might
7  consist of evidence that the group's members *consistently and repeatedly* have committed
8  criminal activity listed in the gang statute," as noted above, expert testimony as to a
9  gang's primary activities is also sufficient.  Sengpadychith, 26 Cal.4th at 324 (citing
10 Gardeley, 14 Cal.4th at 620) (emphasis in original).

11     Thus, after viewing the evidence presented at trial in the light most favorable to the
12 prosecution and presuming the jury resolved all conflicting inferences from the evidence
13 against Petitioner, the Court finds a rational juror "could reasonably have found beyond a
14 reasonable doubt" that Petitioner had violated section 186.22(b)(1).  Jackson, 443 U.S. at
15 325-26.  Thus, habeas relief is not warranted on Claim Two.

16     **4.     First Degree Murder**

17     Petitioner's jury also convicted him of the first degree murder of Francisco
18 Herrera.  4 CT at 648.  Petitioner does not argue the prosecution failed to present
19 evidence of any of the elements of first degree murder.  Rather, he argues the evidence of
20 first degree murder was insufficient because the prosecution did not present any
21 "credible" evidence of Petitioner's guilt.  Specifically, Petitioner contends prosecution
22 witness Carlos Nunez "repeatedly lied to everyone."  SAP, at 14.

23     The California Court of Appeal denied Petitioner's claim on direct review,
24 explaining it could not disturb the jury's credibility finding so as to reject the evidence
25 supporting Petitioner's conviction.  Lodg. 10 at 52-53 (citations omitted).  As the state
26 court noted, Petitioner simply asks this Court to reweigh the evidence, reject the jury's
27 credibility determinations, and draw different inferences than those drawn by the trier of
28 fact.  However, this Court is not permitted to reevaluate the evidence or draw new

inferences.  <u>Cavazos v. Smith</u>, 565 U.S. ----, 132 S. Ct. 2, 3-4, 181 L. Ed. 2d 311 (2011)

("[I]t is the responsibility of the jury – not the court – to decide what conclusions should

be drawn from evidence admitted at trial."); <u>Wright v. West</u>, 505 U.S. 277, 296-97, 112

S. Ct. 2482, 120 L. Ed. 2d 225 (1992); <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir.

1995) ("The reviewing court must respect the province of the jury to determine the

credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences

from proven facts by assuming that the jury resolved all conflicts in a manner that

supports the verdict.").

Because this Court must assume the jury found Nunez's testimony credible, it must

reject Petitioner's claim that the untrustworthy testimony was insufficient to support

Petitioner's conviction for first degree murder.  Thus, habeas relief is not warranted on

Claim Seven.

**C.    Petitioner Fails to Demonstrate a Violation of <u>Brady v. Maryland</u> in Claim**

**Three**

**1.    Background**

In Claim Three, Petitioner argues the prosecution committed misconduct pursuant

to <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by

withholding the following evidence:  (1) the gang expert's contacts with the victim and

Petitioner; (2) 75 percent of the gang expert's testimony; (3) the location of the shooting

as being within WTB gang territory; (4) Petitioner's association with the LPS gang; (5)

the firearm examiner's notes; (6) 38-pages of handwritten notes, printouts, call details,

and call logs; (7) the research studies relied upon by the criminalist in forming opinions;

(8) information related to a phone used on the night of the shooting; (9) evidence South

Gate Police Detective Carlos Corella had more than one prior contact with Petitioner;

(10) notes from mid-trial interviews with Carlos Nunez; (11) police records on WTB

members; and (12) a current curriculum vitae for the gang expert.  SAP, at 6; Lodg. 11 at

41-43.  For clarity, the Court has divided this evidence into the following categories: (1)

non-favorable evidence; (2) non-existent evidence; and (3) *potentially* impeaching evidence.

### 2. State Court Opinion

The California Court of Appeal found no <u>Brady</u> error with respect to the evidence underlying Petitioner's claim.  The state court reasoned Petitioner failed to show how the evidence was helpful or that any evidence the defense had a statutory right to was actually suppressed.  Lodg. 10 at 20-34.

### 3. Legal Standard

"In <u>Brady</u>, the Supreme Court held'[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Runningeagle v. Ryan</u>, 686 F.3d 758, 769 (9th Cir. 2012) (quoting <u>Brady</u>, 373 U.S. at 87).  "The elements of a claim for a <u>Brady</u> violation are that '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" <u>Gonzalez v. Wong</u>, 667 F.3d 965, 981 (9th Cir. 2011), <u>cert. denied</u>, 133 S. Ct. 155 (2012) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

### 4. Non-Favorable Evidence

Petitioner argues the prosecutor failed to disclose information related to: (1) the gang expert's contacts with the victim and Petitioner; (2) 75 percent of the gang expert's testimony; (3) the location of the shooting as being within WTB gang territory; (4) Petitioner's association with the LPS gang; (5) the firearm examiner's notes; (6) 38-pages of handwritten notes, printouts, call details, and call logs; (7) the research studies relied upon by the criminalist in forming opinions; (8) information related to a phone used on the night of the shooting; and (9) evidence that South Gate Police Detective Carlos Corella had more than one prior contact with Petitioner.  Lodg. 11 at 41-43.

To the extent Petitioner did not receive these items of evidence in a timely manner, he has failed to offer any argument that the evidence was favorable to his defense. Even now, years after the evidence was made known to Petitioner, he has not shown how any of this evidence might have been used to assist his defense. This Court has reviewed the pages from the record Petitioner has cited in support of his claim and finds no basis upon which it can find the evidence exculpatory or impeaching.[12] Ultimately, Petitioner has not shown that any of these items of discovery would have exculpated him or impeached the witnesses at his trial. A prosecutor's failure to disclose such non-favorable evidence does not establish a <u>Brady</u> violation.

### 5.     Nonexistent Evidence

In addition, Petitioner argues the prosecutor violated <u>Brady</u> by failing to disclose notes from mid-trial interviews with Carlos Nunez. Lodg. 11 at 42. However, the prosecutor informed the trial court that no such notes existed and Petitioner has failed to prove otherwise. 15 RT at 3909-10. The prosecutor could not have violated <u>Brady</u> for failing to disclose evidence that did not exist.

### 6.     *Potentially* **Impeaching Evidence**

Finally, Petitioner complains the prosecutor did not disclose police records on WTB members and a current curriculum vitae for the gang expert. Lodg. 11 at 42. While this Court recognizes this evidence had the *potential* to be impeaching, Petitioner has failed to establish that the evidence would have *actually* been impeaching. Hence, Petitioner has failed to show that the failure to disclose the evidence was prejudicial.

First, Petitioner has not shown the police records contained any reference to individuals related to the trial. Moreover, evidence that certain gang members had been under investigation or subject to arrest could not automatically have been used for

---

[12] With respect to some of the evidence, defense counsel expressed an inability to fully cross-examine witnesses without the evidence in question. <u>See</u>, <u>e.g.</u>, 14 RT at 3617, 15 RT at 3902, 16 RT at 4276. However, it is clear counsel was referring to cross-examination aimed at *minimizing the damage* to Petitioner as opposed to cross-examination that was exculpatory or would have impeached the witnesses.

impeachment.  See <u>Kennedy v. Superior Court</u>, 145 Cal. App. 4th 359, 379 (2006) (trial court did not abuse discretion in denying discovery request for evidence of witness's prior arrest because, without any other showing of relevancy, the evidence was not relevant for impeachment purposes); <u>but</u> <u>see</u> <u>People v. Martinez</u>, 103 Cal. App. 4th 1071, 1080-81 (2002) (prosecution witness can be impeached with evidence of charges pending at the time of trial because witness may be testifying in order to seek favor or leniency). In fact, even if the records established individuals had sustained criminal convictions, the evidence would not have been automatically admissible for impeachment purposes.  Cal. Const., art. I, § 28(f)(4) (felony convictions may "be used without limitation for purposes of impeachment"); <u>People v. Carter</u>, 227 Cal. App. 4th 322, 329 (2014) ("A witness may be impeached with proper conduct that involves moral turpitude, whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion pursuant to Evidence Code section 352.").  Thus, Petitioner has not shown the police reports contained any exculpatory or impeaching evidence that would have been admissible at trial or that the failure to disclose the reports was in any way prejudicial.

In addition, while, in theory, a current curriculum vitae might have held some type of information the defense could have used to impeach the gang expert, Petitioner has not shown that an updated curriculum vitae would have actually contained any information helpful to the defense or that the failure to disclose it was prejudicial.  Consequently, Petitioner has not established a <u>Brady</u> violation.  <u>See</u> <u>Phillips v. Woodford</u>, 267 F.3d 966, 987 (9th Cir. 2001) (rejecting <u>Brady</u> claim where petitioner failed to prove that a report existed or that it would have contained exculpatory evidence).  Because Petitioner has not shown the prosecutor was in possession of exculpatory or impeaching evidence and failed to disclose the evidence to the defense, Petitioner has not shown the prosecution violated <u>Brady</u> by suppressing evidence.[13]

---

[13]  Petitioner's related claim that the trial court erred in failing to sanction the prosecutor for the alleged discovery violations is not cognizable.  A state prisoner is entitled to federal habeas corpus relief if he is in custody in violation of the Constitution,

Accordingly, the state courts' rejection of Petitioner's <u>Brady</u> claims was neither contrary to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on Claim Three.

**D.      Petitioner Fails to Demonstrate a Violation of <u>Doyle v. Ohio</u> in Claim Four**

**1.      Background**

In Claim Four, Petitioner argues the prosecutor committed misconduct pursuant to <u>Doyle v. Ohio</u>, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), by asking a police detective whether Petitioner complained of being shot despite the prosecutor's knowledge that Petitioner had invoked his right to remain silent.  (SAP, at 6.)  Petitioner's claim relies on the following exchange during the prosecutor's direct examination of Detective Kathleen Gallagher:

> Q      And did -- did Martin Sanchez complain of any bullet wounds to his person?
>
> . . .
>
> A      He did not.
>
> Q      Did Henry Zarazu complain of any bullet or gunshot wounds to his body?
>
> . . .
>
> [Petitioner's Counsel]: I'd object.  Ask to approach the bench.
>
> The Court: All right.  You can approach.
>
> . . .
>
> [Petitioner's Counsel]: Your honor, Mr. Zarazu invoked his Miranda rights immediately upon being questioned.  And I think this is impermissible

---

laws, or treaties of the United States.  <u>See</u> U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  Here, Petitioner complains only of state law errors – specifically, the trial court's failure to impose state-authorized sanctions for the prosecutor's purported discovery violations.  Such a state law claim does not warrant federal habeas relief.

comment on the defendant's assertion of those rights and his right to remain silent.

[Co-Defendant's Counsel]: Violative of Griffin versus California and I move for a mistrial.

[Petitioner's Counsel]: I'd object under the Fifth Amendment, Sixth Amendment, and ask for a mistrial as well.

The Court: You move for a mistrial?

There's been no answer as to either of your clients.  Mr. Sanchez is not represented by either of you, so how do you get a mistrial?

[Co-Defendant's Counsel]: Well, the question was asked as to Mr. Zarazu.

The Court: And you objected and it has not been answered.

[Prosecutor]: And, your honor, the People's position is that it's a -- it's a typical question during booking.  It's necessary for the detectives to ascertain if anyone has been injured so that medical treatment can be obtained prior to booking, that it's not -- it's not necessarily an inculpatory statement and it's not necessarily a statement that would fall within the purview of Miranda.

The Court: there's no testimony that she asked those statements at booking.  It could have been another officer.

. . .

So the objection is sustained.

[Prosecutor]: Okay.  I'll lay that foundation.

[Petitioner's Counsel]: I'd ask that it not be gone into.  I don't think it's relevant.  There's no evidence that - we're certainly not indicating that he was shot, that he received a gunshot wound.  They've shown a photograph of him.  But I think going into it does -- is an impermissible comment on his right to remain silent and his invocation of that right.

1   [Prosecutor]: I'll ask it a different way.  I'll ask if there was any
2   indication that Defendant Zarazu had been shot on that night.  And I'll ask the
3   same question as it related to Defendant Perez.

4   The Court: That's fine.

5   [Prosecutor]: Thank you.

6   . . .

7   Q   Detective Gallagher, was there any indication, when you saw
8   Defendant Henry Zarazu at the station, that in fact Defendant Zarazu had
9   suffered any bullet or gunshot wounds?

10   A   No.

11   16 RT at 4292-95.

12   **2.   State Court Opinion**

13   The California Court of Appeal denied Petitioner's claim on direct review.  The
14   Court of Appeal explained the prosecutor's question did not violate <u>Doyle</u> because "[t]he
15   prosecutor merely asked a percipient witness for her observations of appellants'
16   conditions on the night of the shooting."  Lodg. 10 at 37.  The state court further
17   explained that even if the question was improper the trial court sustained an objection
18   before the detective responded.  <u>Id.</u>

19   **3.   Legal Standard**

20   A suspect in a criminal investigation has a Fifth Amendment right to remain silent.
21   U.S. Const. amend. V.  This constitutional guarantee includes the assurance that a
22   defendant's "silence will carry no penalty."  <u>Doyle v. Ohio</u>, 426 U.S. 610, 618, 96 S. Ct.
23   2240, 49 L. Ed. 2d 91 (1976).  A prosecutor violates <u>Doyle</u> when he uses the defendant's
24   post-arrest silence as evidence of guilt.  <u>Greer v. Miller</u>, 483 U.S. 756, 763-64, 107 S. Ct.
25   3102, 97 L. Ed. 2d 618 (1987).  Thus, for example, when a defendant takes the stand and
26   explains what happened, a prosecutor is not allowed to try to impeach the defendant's
27   testimony by pointing out to the jury that the defendant failed to offer that explanation
28   following his arrest and, instead, elected to remain silent.  <u>Doyle</u>, 426 U.S. at 618-20.

1    There is no <u>Doyle</u> violation, however, if the trial court promptly sustains a timely

2    objection to a question concerning post-arrest silence, instructs the jury to disregard the

3    question, and provides a curative jury instruction.  <u>See</u> <u>Greer</u>, 483 U.S. at 764-65.  A

4    prosecutor does not "use" a defendant's post-arrest silence if the trial court sustains

5    timely objections to improper questions and thereby short-circuits the inquiry into the

6    silence.  <u>Id.</u> at 764.

7        To prevail on a <u>Doyle</u> claim a petitioner has the burden of establishing that any

8    error had a substantial and injurious effect on the verdict.  <u>Brecht v. Abrahamson</u>, 507

9    U.S. 619, 622, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); <u>Hurd v. Terhune</u>, 619 F.3d

10    1080, 1089-90 (9th Cir. 2010).

11        **4.    Discussion**

12        The trial court sustained timely objections to the prosecutor's single question that

13    arguably commented upon Petitioner's post-arrest silence.  There was, therefore, no "use"

14    of Petitioner's post-arrest silence.  <u>Greer</u>, 483 U.S. at 764.

15        Nonetheless, even if the trial court stopped the prosecutor from improperly using

16    Petitioner's silence against him, it could be argued that it was inappropriate for the

17    prosecutor to approach the subject in the first place.  <u>Greer</u>, 483 U.S. at 765.  However, a

18    habeas petition alleging prosecutorial misconduct will be granted only when the

19    misconduct "so infect[s] the trial with unfairness as to make the resulting conviction a

20    denial of due process."  <u>Id.</u> at 765.  Here, however, Petitioner complains of a single

21    question that tangentially related to Petitioner's silence to which there was no responsive

22    answer because the trial court sustained an objection before the witness could reply.

23    Under these circumstances, there is no likelihood that such a question rendered

24    Petitioner's trial so unfair as to violate due process.

25        Accordingly, the state courts' rejection of Petitioner's <u>Doyle</u> claim was neither

26    contrary to, nor an unreasonable application of, clearly established federal law.  28 U.S.C.

27    § 2254(d).  Habeas relief is not warranted on Claim Four.

28

**E.     Petitioner Fails to Demonstrate Error with Respect to the Exclusion of
Evidence in Claim Five**

**1.     Background**

In Claim Five, Petitioner contends the trial court erroneously excluded a poem
found in a notebook near Nunez's car on the night of the shooting.  Petitioner claims the
poem was evidence of the victim's gang membership.  The California Court of Appeal
accurately detailed the facts underlying Petitioner's claim:

> During cross–examination of Detective O'Malley, Zarazu's counsel
> indicated that he wanted to ask the detective about notebooks found near
> Nunez's car on the night of the shooting.   The notebooks contained
> gang–related writings.  When the prosecution objected, the court decided to
> hold an Evidence Code section 402 hearing regarding the two notebooks.
> Nunez admitted the notebooks were his, were inside the trunk of his car, and
> contained some of his writings.  His friends in WTB also had access to the
> notebooks.  The court ruled that the entirety of one notebook was admissible.
> As to the other notebook, the defense wanted to use a poem that Nunez wrote,
> which read as follows: "Carlos came from Wicked Town Bandits. [¶] Fucking
> up the block and putting putos to sleep.  We think bad kriminales in the crazy
> ass streets.  Yes, [we] came up with this gangster ass beats so you bitches to
> hear."  He wrote the poem approximately four years before, which would have
> been around June 2005.  Appellants argued that the poem was evidence Nunez
> was a violent person who actually set the shooting in motion, that they could
> cross–examine the gang expert about the meaning of the poem, and it was thus
> relevant to their self–defense theory.   The court ruled that the poem was
> inadmissible character evidence of the victim in the case.  The court further
> ruled that the defense could ask the gang expert questions about other writings
> in the notebook, including a list of the WTB members by moniker and

a writing that appeared to describe a clique within the gang called WTB "Locos."

Lodg. 10 at 44-45.

### 2.   State Court Opinion

The California Court of Appeal denied Petitioner's claim, reasoning the notebook was not admissible under state law as character evidence and any error in failing to admit the notebook as evidence of Nunez's motive to attack was not prejudicial in light of other evidence to support Petitioner's self-defense theory.  Lodg. 10 at 44-46.

### 3.   Discussion

Challenges to a state trial court's evidentiary rulings are not cognizable on federal habeas review unless the admission or exclusion of evidence violated a petitioner's due process right to a fair trial.  Estelle v. McGuire, 502 U.S. 62, 70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  Montana v. Egelhoff, 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (internal quotation marks omitted) (quoting Patterson v. New York, 432 U.S. 197, 201-02, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977)).

One of the fundamental rules that may be violated by the erroneous exclusion of defense evidence is the Sixth Amendment right to present a defense.  DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) and Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)).  However, the constitutional right to present a defense is not absolute.  Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009) (a defendant's right to present relevant evidence "is not unlimited, but rather is subject to reasonable restrictions, such as evidentiary and procedural rules.") (citation omitted) (internal quotation marks omitted).  "Even relevant and reliable evidence can be excluded when the state interest is strong."  Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  The United States Supreme Court has stated "the Constitution permits judges to exclude

evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006). (internal quotation marks and citations omitted).

The evidence excluded here is just the type of repetitive and marginally relevant evidence that may be excluded without offending the Constitution. First, the jury was presented with other evidence that Nunez was a member of WTB. In fact, the entire case revolved around the gang rivalry of Petitioner's LPS gang and Nunez's WTB gang. In addition, a poem about generic gang activity written about 8 months before the shooting incident had little relevance to the issue before the jury. Such an exclusion of repetitive and marginally relevant evidence does not violate due process.

Based on the foregoing, the Court finds the California court's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.[14]

---

[14] This Court notes Petitioner argued in state court that the trial court violated his Sixth Amendment right to confront witnesses by precluding cross-examination of the gang expert based on the excluded evidence. It is not clear whether Petitioner intended to raise such a claim here. While Petitioner cites the Sixth Amendment as supporting his claim, SAP, at 6, he argues only that the exclusion of evidence was erroneous. He makes no mention of the impact of the exclusion on the cross-examination of the gang expert. SAP, at 6. To the extent Petitioner intended to raise a claim regarding his ability to cross-examine the gang expert, this Court has considered his claim and found that it lacks merit. See Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (trial judges "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."); Chamberlain v. Pliler, 307 F. Supp. 2d 1128, 1146-47 (C.D. Cal. 2004) (finding no Confrontation Clause violation where the probative value of evidence of a warrant for the victim's arrest was slight and the jury had sufficient information to appraise the bias and motive of the victim).

**F.     Petitioner Fails to Demonstrate Instructional Error in Claim Six**

**1.     Background**

In Claim Six, Petitioner argues the trial court erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter.  SAP, at 6.  In Claim Eight, Petitioner contends the trial court erred by instructing the jury on extraneous factors.  SAP, at 14.

**2.     Legal Standard**

Claims of error in state jury instructions are generally a matter of state law and do not usually invoke a constitutional question.  Gilmore v. Taylor, 508 U.S. 333, 342-343, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993).  "Claims that merely challenge the correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights."  Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986); see also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief.").

A jury instruction violates due process only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  McGuire, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).  It is not sufficient to show that "the instruction is undesirable, erroneous, or even 'universally condemned.'"  Henderson v. Kibbe, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) (quoting Cupp, 414 U.S. at 154).  The instruction must be considered in the context of the trial record and the instructions as a whole.  McGuire, 502 U.S. at 72; see also Middleton v. McNeil, 541 U.S. 433, 437-38, 124 S. Ct. 1830, 158 L. Ed. 2d 701 (2004).

**3.     Voluntary Manslaughter**

Petitioner argues the trial court should have instructed the jury on the lesser included offense of voluntary manslaughter based on the defense theory of heat of passion and provocation.  SAP, at 6.

44

1    The California Court of Appeal rejected Petitioner's claim on direct review. The

2    court concluded the voluntary manslaughter instruction was not warranted because "there

3    was absolutely no evidence that appellants acted under the 'actual influence of a strong

4    passion' or intense emotion at the time of the shooting." Lodg. 10 at 49. The Court of

5    Appeal further concluded any error in failing to issue the instruction was harmless. Lodg.

6    10 at 50.

7         **a.    There is No Clearly Established Federal Law That Failure to**

8              **Instruct on a Lesser-Included Offense in a Non-Capital Case**

9              **Constitutes Constitutional Error**

10        In Beck v. Alabama, the Supreme Court held the failure to instruct the jury on a

11   lesser-included offense in a capital case would be a constitutional error if there was

12   evidence to support the instruction. 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392

13   (1980). The Beck Court, however, did not decide whether the due process clause would

14   require the giving of a lesser-included offense instruction in a non-capital case. See id. at

15   638 n.14. The Ninth Circuit, noting this uncertainty of Beck's applicability, declined to

16   extend the Beck holding to non-capital cases. See Turner v. Marshall, 63 F.3d 807, 819

17   (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir.

18   199) (en banc); see also Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam)

19   (holding that "the failure of a state court to instruct on a lesser offense [in a noncapital

20   case] fails to present a federal constitutional question and will not be considered in a

21   federal habeas corpus proceeding.") (citations omitted) (internal quotation marks

22   omitted). Accordingly, because there is no clearly established federal law that requires a

23   trial court to instruct on a lesser-included offense in a non-capital case, the Court has no

24   authority to grant relief on Petitioner's claims. See also Carey v. Musladin, 549 U.S. 70,

25   77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) ("Given the lack of holdings from [the

26   Supreme] Court regarding [petitioner's claim], it cannot be said that the state court

27   unreasonably applied clearly established Federal law.") (citation omitted) (internal

28   quotation marks omitted); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).

45

1
2
3
4

        **b.**     **<u>The State Court's Rejection of Petitioner's Voluntary</u>**
                 **<u>Manslaughter Instructional Error Claim Was Neither Contrary,</u>**
                 **<u>Nor Involved an Unreasonable Application of Clearly Established</u>**
                 **<u>Federal Law</u>**

5
6
7
8
9
10
11
12
13
14

      The Ninth Circuit *has* recognized that a clearly established and cognizable constitutional claim may be stated where a state court has refused a requested lesser offense instruction that is consistent with the defendant's theory of defense.  See <u>Solis</u>, 219 F.3d at 929 (stating that "the defendant's right to adequate jury instructions on his or her theory of the case might, in some case, constitute an exception to the general rule") (citing <u>Bashor</u>, 730 F.2d at 1240).  As the court in <u>Solis</u> made clear, however, this possible exception does not apply if there is insufficient evidence supporting the proffered lesser offense instruction.  <u>Id.</u> at 929-30 (finding no constitutional error in refusal to give lesser-included voluntary manslaughter instruction where there was no substantial evidence to support the instruction under state law).

15
16
17
18
19
20
21

      Here, the California Court of Appeal specifically found the trial court need not have given the lesser-included instructions because the evidence did not support those instructions.  Absent clear and convincing evidence to the contrary, a state court's factual finding is entitled to a presumption of correctness.  <u>Miller-El</u>, 537 U.S. at 340 (citing 28 U.S.C. § 2254(e)(1)); <u>Mitzel v. Tate</u>, 267 F.3d 524, 537 (6th Cir. 2001) (state court's factual finding that there was insufficient evidence to support an instruction entitled to presumption of correctness).  Petitioner has not overcome that presumption.

22
23
24

      Moreover, a review of the record confirms the state court's finding that the evidence did not support a voluntary manslaughter conviction.  The California Supreme Court has explained the elements of heat of passion voluntary manslaughter:

25
26

      A heat of passion theory of manslaughter has both an objective and a subjective component.

27
28

      To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to

1    "sufficient provocation." . . . The provocative conduct by the victim may be
2    physical or verbal, but the conduct must be sufficiently provocative that it
3    would cause an ordinary person of average disposition to act rashly or without
4    due deliberation and reflection.

5        . . .

6        To satisfy the subjective element of this form of voluntary manslaughter,
7    the accused must be shown to have killed while under the actual influence of
8    a strong passion induced by such provocation. . . . However, if sufficient time
9    has elapsed between the provocation and the fatal blow for passion to subside
10   and reason to return, the killing is not voluntary manslaughter.

11   People v. Moye, 47 Cal.4th 537, 549-50 (2009) (internal quotation marks and citations
12   omitted).

13   The evidence presented at trial essentially established that Herrera called Nunez
14   because he was being chased. When Nunez showed up, Herrera jumped into Nunez's car
15   at the same time Petitioner drove up along side. Shots were fired into Nunez's car,
16   hitting Herrera. This evidence proved neither that "an ordinary person of average
17   disposition" would have acted rashly in the face of the actions of Nunez and Herrera nor
18   that Petitioner acted under "the actual influence of a strong passion induced by" any
19   provocative acts of Nunez and Herrera. To the extent the prosecution argued that a
20   prolonged gang rivalry provided the motive for the shooting, the defense still could not
21   argue that Petitioner was acting under the heat of passion, as there was no evidence of
22   conduct leading up to the shooting that would have put Petitioner in an immediate state of
23   provocation. Because the evidence did not support a voluntary manslaughter instruction,
24   the trial court did not err in failing to instruct the jury on such a lesser included offense.

25   Based on the foregoing, the Court finds the California court's rejection of
26   Petitioner's claims was neither contrary to, nor involved an unreasonable application of,
27   clearly established federal law, as determined by the United States Supreme Court. Thus,
28   habeas relief is not warranted on this claim.

47

### 4. Extraneous Factors

Next, Petitioner argues the trial court erred by instructing the jury on extraneous factors. Specifically, Petitioner complains the trial court instructed the jury on "the perils and expense of a mistrial" and instructed the jury "how to pick a foreperson and the type of foreperson to pick." SAP, at 14. Petitioner's claim refers to a packet of "Jury Information" the trial court included with the jurors' notebooks. 4 RT at 734. As relevant to Petitioner's claim, that information instructed the jury as follows:

> . . . Do not approach the attorneys, parties or the judge for any reason. Such an approach may be misconstrued and may result in a mistrial. . . .
>
> Please remember that you are <u>not</u> advocates for any party or side but are impartial judges of the facts. It would therefore be a violation of your oaths as jurors to conduct any independent investigation, such as driving by the scene of the incident, if there is one, or consulting reference works, or talking to others for additional information. Even referring to the dictionary or looking up something on the Internet to answer a question you might have relating to the trial, raises the very real and very expensive probability of a mistrial.
> . . .
>
> The following comments are suggestions to aid in your deliberations in the jury room. None of them are mandatory. . . .
>
> In choosing a foreperson, a random selection may not be the best way to proceed. You may want to look for a juror who is a good listener, can organize the evidence and tasks, who can be certain that everyone is heard, and who can help jurors understand why different people may have different opinions. You may want to select someone who has some managerial, supervisory or organizational skills.

Augmented CT at 29-30, 34-35.

Petitioner has not cited any clearly established Supreme Court precedent holding a trial court commits constitutional error by providing general jury instructions including

48

1   informing the jury of the potential expense of a mistrial or by suggesting to the jury how

2   it might go about choosing a foreperson.  A state court's decision cannot be contrary to,

3   or an unreasonable application of, clearly established federal law, if no Supreme Court

4   precedent creates clearly established federal law relating to the legal issue the habeas

5   petitioner raised in state court.  <u>Carey v. Musladin</u>, 549 U.S. 70, 77, 127 S. Ct. 649, 166

6   L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding regarding the

7   prejudicial effect of spectators' courtroom conduct, the state court's decision could not

8   have been contrary to or an unreasonable application of clearly established federal law);

9   <u>see</u> <u>also</u> <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004).

10        Accordingly, the state courts' rejection of Petitioner's claim was neither contrary

11   to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. §

12   2254(d).  Petitioner is not entitled to habeas relief on Claim Eight.

13   **G.    Petitioner Fails to Demonstrate the Impropriety of the Gang Expert Testimony**

14   **in Claim Nine**

15        In Claim Nine, Petitioner claims the gang expert's testimony invaded the

16   province of the jury because the expert testified "why the driver maneuvered his car and how

17   the driver maneuvered the car to enhance the gang's status."  SAP, at 14.  Petitioner's claim

18   appears to rest on the following testimony by Detective O'Malley:

19        Q  And, so, now, even for just say the driver of that suspect vehicle, the

20        driver of that green Ford Mustang, if when the Mustang pulls alongside the

21        victim's vehicle, both facing one direction, and pulls himself forward towards

22        the steering wheel, looks to his right, directly at Carlos Nunez, would you be

23        able to form an opinion if the driver was also participating and acting in

24        furtherance of the Los Paranderos Gang?

25        [Petitioner's Counsel]: I'll object.

26        The Court: Sustained.

27        By [The Prosecutor]:

28        Q  When -- do gang members on missions typically have different roles?

49

1      A  Yes.

2      Q  Okay.  And can you describe the different roles that gang members on

3   a mission would have?

4      A  If they're driving around, you'll have one person who will be the

5   driver, another person who will be designated as the shooter.  You can have

6   another person in the car -- depending on how many people in the car, if there's

7   a third person in the car, he will be as an observer, might be calling out,

8   shouting out his gang's name and whatnot.

9   . . .

10      Q  So if -- if a victim's car or a Wicked Town Bandits gang member's

11   car has pulled to the curb directly behind a car, in front of it, and a Los

12   Paranderos car pulls up alongside the driver's side of the Wicked Town

13   Bandit's car, basically making it so that the only direction of travel that the

14   Wicked Town Bandit's car can -- can turn, would you say that the driver is in

15   control of that action?

16   . . .

17      [A]  Yes.

18   . . .

19      Q  Okay.  And can you explain that?

20      A  When he pulled his car up, the driver has control of the vehicle.  And

21   if the roadway is completely clear and he stops his vehicle in a manner that

22   obstructs another vehicle from pulling from the curb or moving --

23   . . .

24      Q  Okay.  So if you have a situation where members of the Wicked Town

25   Bandits gang pull up in a car and they pull to the curb directly behind another

26   car and almost immediately a car driven by a Los Paranderos gang member

27   pulls up alongside the Wicked Town Bandits car and blocks their -- the Wicked

28   Town Bandits' ability to pull forward and pull out, is that -- is that an action

50

1      that would or could benefit the Los Paranderos gang?

2              A  Yes.

3              Q  And can you explain that?

4              A  It would trap that vehicle in and allow an opportunity for them, the

5      members of LPS, to commit violence on the members of Wicked Town

6      Bandits.

7      11 RT at 2751, 2755-56.

8              First, the trial court did not err in allowing the challenged gang expert testimony.

9      Under California law, an expert may offer opinion testimony "[r]elated to a subject that is

10     sufficiently beyond common experience that . . . would assist the trier of fact[.]"  Cal.

11     Evid. Code § 801(a).  In addition, the California Supreme Court has held that the culture

12     and habits of street gangs are matters sufficiently beyond common experience as to

13     render expert testimony on such matters admissible.  See People v. Gardeley, 14 Cal.4th

14     605, 617 (1996).  Accordingly, "[e]xpert testimony is admissible to establish the

15     existence, composition, culture, habits, and activities of street gangs; a defendant's

16     membership in a gang; gang rivalries; the motivation for a particular crime, generally

17     retaliation and intimidation; and whether and how a crime was committed to benefit or

18     promote a gang."  Id. (citation omitted).

19             Second, there is no merit to Petitioner's claim that the gang expert's opinion

20     invaded the province of the jury by making conclusions regarding the driver's

21     maneuvering of the car and how that might enhance the gang's reputation.  Under

22     California law, "[t]estimony in the form of an opinion that is otherwise admissible is not

23     objectionable because it embraces the ultimate issue to be decided by the trier of fact."

24     Cal. Evid. Code § 805.  In addition, the Ninth Circuit has observed that the United States

25     Supreme Court has never held "that the Constitution is violated by the admission of

26     expert testimony concerning an ultimate issue to be resolved by the trier of fact."  Moses

27     v. Payne, 555 F.3d 742, 761 (9th Cir. 2009).  Indeed, in Moses, the Ninth Circuit noted

28     the lack of such Supreme Court precedent was unsurprising because it is "well

51

1 established . . . that expert testimony concerning the ultimate issue is not *per se*

2 improper." Id. (internal quotation marks and citation omitted).  As stated above, a state

3 court's decision cannot be contrary to, or an unreasonable application of, clearly

4 established federal law, if there is no Supreme Court precedent on the issue.  Carey v.

5 Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006); see also Brewer v.

6 Hall, 378 F.3d 952, 955 (9th Cir. 2004).

7       Accordingly, the state courts' rejection of Petitioner's claim was neither contrary

8 to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. §

9 2254(d).  Petitioner is not entitled to habeas relief on Claim Nine.

10 **H.     Petitioner Fails to Demonstrate Trial Court Error for Denigrating Defense**

11 **Counsel**

12      In Claim Ten, Petitioner argues the trial court unfairly denigrated defense

13 counsel in front of the jury because it "consistently admonished defense counsel in front of

14 the jury and implied defense counsel acted in an underhanded manner."  SAP, at 15.

15 Petitioner's claim appears to rest on the following comments by the trial court.

16      First, the parties engaged in the following exchange during Nunez's testimony:

17          [Petitioner's Counsel]: Your honor, there would . . . be a hearsay

18      objection.

19          The Court: All right.

20          [Co-Defendant's Counsel]: Join.

21          The Court: It's offered under 1237?

22          [Prosecutor]: Yes, your honor.

23          The Court: All right.  Overruled.

24          [Petitioner's Counsel]: And also Sixth Amendment, confrontation.

25          [Co-Defendant's Counsel]: Join.

26          The Court: That's not a well-taken objection as you both know.

27 19 RT at 5124-25.

28      In addition, the trial court cautioned Petitioner during closing arguments, as follows:

52

1      [Petitioner's Counsel]: . . . And is the prosecutor -- prosecutor going to

2      file charges [against Nunez]?  Is her office going to file charges on this man for

3      perjury, for subverting really the basic core of this justice system?

4      [The Prosecutor]: Objection.  Improper argument.

5      [Petitioner's Counsel]: No, she's going to say . . .

6      [The Prosecutor]:  Whether the D.A.'s office is going to --

7      The Court: Sustained.

8      [The Prosecutor]: Thank you.

9      The Court: And the jury is admonished to disregard that portion of his

10    argument.

11      And I'm going to admonish you not to do that again.

12      [Petitioner's Counsel]: Thank you.  Thank you, your honor.

13      Is he going to be charged?  He's a perjurer --

14      [The Prosecutor]: Objection, you honor.  Again, improper argument, is

15    he going to be charged.

16      The Court: Sustained.

17      That's not an issue for the jury to decide.

18      . . .

19      [Petitioner's Counsel]:  This was another prosecution exhibit.  And the

20    way I kind of understood it was the area in black was the Wicked Town Bandit

21    area.  I don't know.  It's kind of hard to figure out this map here, but to Long

22    Beach Boulevard and Firestone and then California.  But that's the -- the

23    Wicked Town -- that's the -- I'm sorry.  I thought it was up there.

24      That's the Wicked Town area.  But somehow the Wicked Town area,

25    there's this one, like, stretch of San Carlos that's never, again, been

26    documented, not one F.I. card, nothing in the police files to say that. And that's

27    pretty far from where the incident was.   I mean, again, there's no

28    measurements, we don't know miles, we don't know distances.   The

prosecution has never given you anything like that.  But their whole thing is over there, but they have this one little street that's Wicked Town Bandit territory.

I didn't see anything.  I asked O'Malley, I asked him if he had documentation. He said he might have something.  He wasn't re-called.  He wasn't brought up.  They didn't have him show that there was any kind of documentation.  If there was, they would have put it on.

[The Prosecutor]: Objection, your honor.  Improper argument.

The Court: Sustained.

[Petitioner's Counsel]: The prosecutor --

[The Prosecutor]: Move to admonish.

The Court: I'm going to admonish you.  You know your parameters, counsel.

23 RT at 6640-41, 6714-15.

"A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias . . . or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." United States v. Parker, 241 F.3d 1114, 1119 (9th Cir. 2001) (internal quotation marks and citation omitted).  However, "a trial judge is more than a moderator or umpire.  His responsibility is to preside in the manner and with the demeanor to provide a fair trial to all parties and his discretion in the performance of this duty and management is wide." United States v. Larson, 507 F.2d 385, 389 (9th Cir. 1974) (internal quotation marks and citation omitted).

Here, Petitioner points to three isolated comments by the trial court throughout a lengthy and complicated trial, each of which were responses to objections made by one of the parties and not initiated by the trial court alone.  These brief statements by the trial court could not have rendered Petitioner's trial fundamentally unfair.  See United States v. Rutgard, 116 F.3d 1270, 1279-80 (9th Cir. 1997) (trial court's comment about defense

1    counsel's understanding of honesty and fact that trial court "treated government counsel

2    less brusquely" than defense counsel did not destroy fairness of trial).

3        Accordingly, the state courts' rejection of Petitioner's claim was neither contrary

4    to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. §

5    2254(d).  Petitioner is not entitled to habeas relief on Claim Ten.

6    **I.    Petitioner Fails to Demonstrate the Prosecutor Committed Misconduct by**

7            **Disparaging Defense Counsel**

8        Petitioner argues in Claim Eleven the prosecutor committed misconduct by

9    disparaging defense counsel during closing arguments.  Petitioner claims "[t]he

10   prosecutor accused trial counsel of misconduct by failing to present evidence as he

11   [defense counsel] promised in opening statement."  SAP, at 15.  Petitioner's claim

12   appears to rest on the following portion of the prosecutor's closing argument:

13           . . . [S]tatements of counsel are not evidence.  And, in this case, there's

14       a big reason that the court instructs you that statements of counsel are not

15       evidence is that we all have our notes.  We write our notes, we take our notes,

16       but they are not the actual record of the court reporter.  And both sides have

17       their theories of the case and have their ideas about what happened.

18           But -- but I'll give you some examples.  And that's this: That during the

19       opening statement, you were promised specifically by [Petitioner's counsel]

20       that you were going to hear that the only thing that Henry Zarazu did was he

21       tried to get away.  And, in this case, you saw that with those two separate

22       shooting locations, he did much more than just try to get away.

23           You were also promised that Nunez sees them and pulls out that Webley

24       revolver that Mr. Montoya showed you, that was found behind the chimney on

25       San Carlos, and that shots were fired from the Cirrus at the Mustang.  And

26       there's no evidence that shots were ever fired from the Cirrus to the Mustang.

27       There are no bullet impacts to the Mustang.  And there's no GSR on victim

28       Nunez' right hand.

1    And, in fact, it was the defense own GSR expert who said -- who said,

2    yes, well, the fact that there's one consistent particle on Nunez' left hand and

3    there's no GSR on his right hand and he's right-handed, that that is consistent

4    with having been shot at from outside the driver's window.  And that was the

5    defense's own expert.  So there's absolutely no evidence that Nunez pulled out

6    the revolver, that Nunez used it, or that any shots whatsoever were fired from

7    the -- from the -- from the Chrysler.

8    Now, statements of counsel, again, are not evidence.  And, please, all of

9    you, the jurors, please use -- use your common sense.

10   24 RT at 6969-70.

11   A habeas petition alleging prosecutorial misconduct will be granted only when the

12   misconduct did "so infect the trial with unfairness as to make the resulting conviction a

13   denial of due process."  Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d

14   618 (1987) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L.

15   Ed. 2d 431 (1974)); see also Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464,

16   91 L. Ed. 2d 144 (1986).  "[T]he touchstone of due process analysis in cases of alleged

17   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."

18   Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  The first

19   issue is whether the prosecutor's remarks or conduct were improper; if so, the next issue

20   is whether such remarks or conduct infected the trial with unfairness.  Tan v. Runnels,

21   413 F.3d 1101, 1112 (9th Cir. 2005) (citing Darden, 477 U.S. at 181).

22   When considering the prosecutor's comments in the context of the trial as a whole, this

23   Court does not find that the prosecutor's single reference to the defense's failure to produce

24   evidence to which it referred during opening statements rendered Petitioner's trial

25   fundamentally unfair.  Cf. United States v. Garcia Guizar, 160 F.3d 511, 521-22 (9th Cir.

26   1998) (prosecutor did not shift the burden of proof in commenting on the defendant's failure

27   to produce evidence); United States v. Soulard, 730 F.2d 1292, 1306 (9th Cir. 1984) ("A

28   prosecutor may properly comment upon the defendant's failure to present exculpatory

56

evidence, so long as it is not phrased to call attention to the defendant's own failure to testify."); see Fischer v. Brown, 2014 WL 2566909, *2 (9 Cir. June 9, 2014) ("[T]he Court of Appeal reasonably concluded that the prosecutor did not commit misconduct in alluding to evidence not presented by the defense.").

Accordingly, the state courts' rejection of Petitioner's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief on Claim Eleven.

## J.   Petitioner Fails to Demonstrate Trial Counsel Was Ineffective

In Claim Thirteen, Petitioner argues his trial counsel was ineffective for failing to object to the prosecutor's disparaging remarks, as discussed in Section I, above.

For Petitioner to prevail on his ineffective assistance of counsel claim, he must satisfy a two-prong test: (1) he must show that counsel's performance was deficient, and (2) he must show that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A court evaluating an ineffective assistance of counsel claim does not need to address both components of the test if a petitioner cannot sufficiently prove one of them. Id. at 697; see also Thomas v. Borg, 159 F.3d 1147, 1152 (9th Cir. 1998).

Moreover, a habeas court's review of a claim under the Strickland standard is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009). The relevant question "is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." Id. (citations omitted). "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Id. (citation omitted).

Petitioner faults counsel for failing to object to the prosecutor's statements. Yet, as discussed in Section I, this Court finds it was not improper for the prosecutor to comment

on the defense's failure to produce evidence.  Accordingly, any objections by counsel to the statements would have lacked merit.  Because a challenge to the trial court's comments would not have been well received, counsel was not ineffective for failing to make such a challenge.  Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (an attorney's failure to make a meritless motion does not constitute ineffective assistance of counsel); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance.").  In addition, the Court finds the prosecutor's comments could not have rendered Petitioner's trial fundamentally unfair.  Thus, Petitioner cannot show that counsel's failure to object resulted in prejudice to Petitioner.

Accordingly, the state courts' rejection of Petitioner's ineffective assistance of trial counsel claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Petitioner is, thus, not entitled to habeas relief on Claim Thirteen.

## K.  Petitioner Fails to Demonstrate Ineffective Assistance of Appellate Counsel

In Claim Twelve, Petitioner argues he received ineffective assistance of appellate counsel for counsel's failure to present on direct appeal the arguments stated in Claims Eight through Eleven, herein.  SAP, at 14-15.

The Strickland standard also applies to claims of ineffective assistance of appellate counsel based on the failure of counsel to raise particular claims on appeal.  Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).  A habeas petitioner must show that, but for appellate counsel's failure to raise the omitted claim(s), there is a reasonable probability that the petitioner would have prevailed on appeal.  In the absence of such a showing, neither Strickland prong is satisfied.  See Pollard v. White, 119 F.3d 1430, 1435-37 (9th Cir. 1997); Miller v. Keeney, 882 F.2d 1428, 1434-35 (9th Cir. 1989).

Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant.  Jones v. Barnes, 463 U.S. 745, 751, 103 S. Ct. 3308, 77

L. Ed. 2d 987 (1983).  Counsel "must be allowed to decide what issues are to be pressed."
Id.  The weeding out of weaker issues is widely recognized as one of the hallmarks of
effective appellate advocacy, and counsel is not deficient for failing to raise a weak issue.
Miller, 882 F.2d at 1434.  There is, of course, no obligation to raise meritless arguments
on a client's behalf.  See Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct.
2052, 80 L. Ed. 2d 674 (1984) (requiring a showing of deficient performance as well as
prejudice).  In order to demonstrate prejudice in this context, Petitioner must demonstrate
that he probably would have prevailed on appeal, but for appellate counsel's errors.  Id. at
1434 n.9.

As discussed in Sections F.4., G, H, and I, this Court finds Petitioner's claims lack
merit.  Hence, appellate counsel could not have been ineffective for failing to present
meritless claims.  Jones v. Ryan, 691 F.3d 1093, 1101 (9th Cir. 2012) (failure of appellate
counsel to raise meritless argument cannot be prejudicial); Wildman v. Johnson, 261 F.3d
832, 840 (9th Cir. 2001) ("appellate counsel's failure to raise issues on direct appeal does
not constitute ineffective assistance when appeal would not have provided grounds for
reversal").

Accordingly, the state courts' rejection of Petitioner's ineffective assistance of
appellate counsel claim was neither contrary to, nor an unreasonable application of,
clearly established federal law.  28 U.S.C. § 2254(d).  Habeas relief is not warranted on
Claim Twelve.

**L.     Petitioner Fails to Demonstrate Cumulative Error**

Finally, in Claim Fourteen, Petitioner contends all the errors alleged in the SAP
accumulated to deny Petitioner his rights to due process and a fair trial.  SAP, at 16.

The California Court of Appeal denied Petitioner's claim on direct appeal to the
extent that Petitioner argues cumulative error resulted from the errors alleged in Claims
One through Eleven of the SAP.  The state court found: "Whether considered
independently or together, any errors or assumed errors were not prejudicial and did not
undermine appellants' convictions.  Appellants received a fair trial."  Lodg. 10 at 54.

1       Cumulative error applies where, "although no single trial error examined in

2   isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple

3   errors may still prejudice a defendant."  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir.

4   2002), as amended June 11, 2002) (quoting United States v. Frederick, 78 F.3d 1370,

5   1381 (9th Cir. 1996)) (internal quotation marks omitted).  However, where no error lies

6   with each alleged claim taken separately, there also rests no cumulative error.  See

7   Mancuso, 292 F.3d at 957 ("Because there is no single constitutional error in this case,

8   there is nothing to accumulate to a level of a constitutional violation.").  Similarly, where

9   no prejudice lies with each alleged claim taken separately, there also rest no cumulative

10  prejudice.  Thompson v. Calderon, 109 F.3d 1358, 1369 (9th Cir. 1997, as amended Mar.

11  6, 1997), rev'd on other grounds, 523 U.S. 538, 566, 118 S. Ct. 1489, 140 L. Ed. 2d 728

12  (1998) ("Finding no prejudice from the errors taken separately, we also find no

13  cumulative prejudice."); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (same).

14      Here, this Court finds none of the alleged errors individually constituted

15  error or prejudiced Petitioner.  Accordingly, the Court finds Petitioner did not

16  suffer any cumulative error that deprived him of due process.

17      Thus, Petitioner's fourteenth and final claim does not merit federal habeas relief.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27

28

**VII.**

**RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order (1) accepting this Final Report and Recommendation; (2) denying the Second Amended Petition; and (3) dismissing this action with prejudice.

DATED: March 6, 2015

_____
HON. KENLY KIYA KATO
United States Magistrate Judge